# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Bruel & Kjaer v. Village of Bensenville*, 2012 IL App (2d) 110500

---

| | |
|---|---|
| Appellate Court Caption | BRUEL AND KJAER, Plaintiff-Appellant, v. THE VILLAGE OF BENSENVILLE, Defendant (Suburban O'Hare Commission, Defendant-Appellee). |
| District & No. | Second District<br>Docket No. 2-11-0500 |
| Filed | April 26, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff's action to recover for the noise-monitoring and radar equipment and systems sold to defendant was properly dismissed as untimely on the grounds that the complaint was filed beyond the 4-year statute of limitations applicable to the sale of goods pursuant to a contract under section 2-725 of the Uniform Commercial Code and that the 10-year statute of limitations in section 13-206 of the Code of Civil Procedure applicable to the sale of services did not apply, since the predominant nature of the transaction as a whole was the sale of goods and the services provided under the contract were incidental to the sale of the "equipment and systems," especially when defendant was referred to as "buyer," defendant was to make a single payment after the equipment was delivered and installed, and plaintiff was supplying goods sufficient to accomplish defendant's purposes. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 10-L-1371; the Hon. John T. Elsner, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|

| Counsel on<br>Appeal | Marios N. Karayannis, of Brady & Jensen, of Elgin, and R. Brent Hatcher, Jr., of Smith, Gilliam, Williams & Miles, P.A., of Gainsville, Georgia, for appellant. |
|---|---|
|  | Patrick K. Bond, Mary E. Dickson, and Scott A. Hadala, all of Bond, Dickson & Associates, P.C., of Wheaton, for appellee. |

| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices McLaren and Hutchinson concurred in the judgment and opinion. |
|---|---|

## OPINION

¶ 1  Plaintiff, Bruel & Kjaer, a supplier of noise-monitoring and radar equipment and systems, appeals the judgment of the circuit court of Du Page County dismissing its complaint against defendant, the Suburban O'Hare Commission, pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2010)), on the ground that plaintiff's complaint was filed outside the four-year statute of limitations that applies to the sale of goods pursuant to a contract under the Uniform Commercial Code (UCC) (810 ILCS 5/2-725 (West 2010)). Plaintiff contends that the contract between the parties predominantly called for the provision of services instead of the sale of goods and was subject to the 10-year limitations period pursuant to section 13-206 of the Code (735 ILCS 5/13-206 (West 2010)). Alternatively, plaintiff contends that the unopposed affidavit of its employee, Imram Mohamed, an engineer who worked on the project, established that material factual issues existed and that they were sufficient to survive defendant's motion to dismiss. We affirm.

¶ 2  In February 1999, plaintiff entered into an agreement with defendant and the Village of Bensenville.[1] Plaintiff agreed to provide certain equipment and services to defendant in exchange for a single payment of $227,000. The agreement labeled plaintiff as the seller and defendant as the buyer in the transaction. As is pertinent here, plaintiff supplies noise-monitoring and radar equipment and systems. Under paragraph 2 of the agreement, plaintiff was to sell to defendant "the upgrade to the noise-monitoring and radar systems, and annual servicing agreements with respect thereto." The exact items, services, and specifications were

---

[1]Plaintiff conceded that the Village of Bensenville was acting solely as defendant's agent and does not dispute the propriety of the trial court's order dismissing it from this action. The Village of Bensenville is not a party to this appeal.

identified in Exhibit A to the agreement.

¶ 3    Plaintiff also agreed to "deliver, assemble, install, test and make fully operational such Equipment and System F.O.B. at the MCI Tower, Bensenville, Illinois, or other site designated" by defendant. Plaintiff further warranted, under paragraph 5 of the agreement, that "all Equipment and services furnished and/or delivered hereunder will be delivered, installed and operated in a workmanship like manner and that the design of the System is fit for the purposes therein purchased."

¶ 4    The agreement further provided that a "material inducement" for defendant to pay the purchase price was the specifications regarding the performance of the equipment and systems. The agreement devoted about 3½ pages to providing the requirements for the performance of the equipment and systems. Under the agreement, plaintiff's equipment and systems were required to produce reliable and complete flight track data, to identify flight arrivals and departures, to identify aircraft flight information, to input data into the Federal Aviation Administration (FAA) Integrated Noise Model, to allow defendant to browse and analyze different geographic information, to correlate flight information to noise events, to provide consistent collection and reporting of the noise-monitoring data, and to ensure that the software was accessible by defendant.

¶ 5    The agreement specified the terms for defendant's acceptance of the equipment and systems, along with the timeline to make the single payment of $227,000. The agreement provided in paragraph 4:

"The Equipment and System shall be delivered and installed F.O.B. at the site identified in Section 2, with all freight and cartage to be paid by Seller [plaintiff]. [Defendant] shall provide the real property for the site location which Seller has advised and represented is suitable and appropriate for the System to function effectively and [defendant] shall provide all of the necessary utilities for the site. Upon final payment, Seller shall deliver to [defendant] a Bill of Sale for the Equipment and System and which shall vest in [defendant] good and marketable title to such Equipment and System free and clear of any and all liens and encumbrances."

¶ 6    The agreement also set forth a service component. In paragraph 2, an annual servicing agreement was referenced. Paragraph 3(j) provided that plaintiff would "provide all software adjustments necessary to insure" that the software for the systems would be accessible to all the member communities of defendant. Exhibit A to the agreement enumerated the work to be provided by plaintiff in upgrading the existing passive radar to Long-Range PASSUR, upgrading the software as necessary, and setting forth terms of additional free services to be offered to defendant as a "most favored customer" by plaintiff and its subcontractor, Megadata.

¶ 7    In its complaint, plaintiff alleged that the software upgrades specified under the agreement included significant efforts devoted to developing new software programs and customizing existing software programs for defendant. Plaintiff alleged that the software it developed was designed to allow defendant to obtain the required information and was not an off-the-shelf product that defendant could have obtained. Additionally, plaintiff alleged that it provided site visits and engineering support during the installation and configuration

of the equipment and systems. For example, as part of the services provided, plaintiff obtained FAA data and compared it to the flight tracks obtained from the systems. Plaintiff also assisted in setting up a case study to display the noise contours based on the systems' flight tracks. Plaintiff further provided defendant with technical assistance over the telephone between 1999 and 2007.

¶ 8 Plaintiff alleged that it provided the equipment and systems, which were accepted and used by defendant. In January 2002, plaintiff submitted a formal approval document and invoice for the $227,000 price specified in the agreement. Plaintiff alleged that defendant did not pay this first invoice, so it again invoiced defendant for the purchase price.

¶ 9 In June 2004, following repeated invoicing, defendant paid plaintiff $50,000 toward the purchase price set forth in the agreement. Thereafter, despite further invoices plaintiff sent to defendant, defendant did not pay any more money toward the purchase price. Plaintiff alleged further that defendant never sent a notice of rejection of any of the equipment or services and that defendant continued to use the equipment and systems, resulting in defendant's success in obtaining nuisance relief.

¶ 10 On November 12, 2010, plaintiff filed its complaint for breach of the agreement. Defendant filed a motion to dismiss under section 2-619 of the Code, arguing that plaintiff's complaint was untimely under the four-year statute of limitations in section 2-725 of the UCC. Plaintiff countered that the UCC statute of limitations was not applicable, because the contract was predominantly for the provision of services and not the sale of goods. Plaintiff argued that, instead, the 10-year statute of limitations governing written contracts set forth in section 13-206 of the Code applied to its action.

¶ 11 In support of its response, plaintiff included an affidavit by Imram Mohamed, a support engineer on the project. Mohamed outlined the time that was spent developing new software and upgrading existing software for the equipment and systems. Mohamed averred that, as a result of these efforts, the software "in no way constituted a pre-developed, stock product." Mohamed compiled a chart, which was attached to the affidavit, that purported to show the number of days spent developing the software and whether that development was for newly developed software or for customizing an existing application. The chart further indicated that the customization and development work was "typically done for each noise monitoring system" plaintiff installs. According to Mohamed's chart, plaintiff spent 52 days creating newly developed software, 37 days customizing software from an existing application for this project, and 72 days of combined work, consisting of "New/Customized application[s]," for a total of 161 days working on software for the project. Mohamed averred that, "[w]ithout the services to develop the software, and without the services to install and support the upgrade," defendant would not have been able to obtain the information it was seeking. Further, Mohamed somewhat redundantly averred that, "[w]ithout the software development services performed by [plaintiff], the actual hardware and other equipment delivered to [defendant] for the system upgrade would have been useless."

¶ 12 On April 28, 2011, the parties argued the motion to the trial court, focusing on whether the software could be considered a good. Plaintiff conceded that software may, in some circumstances, be a good, but argued that there was a sufficient factual controversy,

underscored by Mohamed's affidavit, to preclude a judgment pursuant to section 2-619 of the Code.

¶ 13     On May 1, 2011, the trial court delivered a written order. The court held:

"The law in Illinois is clear and agreed upon by the parties. If a contract is predominantly for goods, then there is a four year limitation period. If a contract is predominantly for a service, then there is a ten year limitation period. This is known as the 'predominant purpose' test.

Initially, there must be a determination of whether the case should be decided on a motion to dismiss. Illinois courts frequently decide the 'predominant purpose' test on a motion to dismiss. [Citation.] The 'predominant purpose' test can be applied to this case at this stage of the proceeding.

[Plaintiff] is a supplier of radar systems. It sold the upgrade and annual service agreement to [defendant]. The Plaintiff had to do extensive development of 22 software applications that took 161 days to complete. [Citation.] The sale of software, whether off the shelf or customized, is the sale of a good not a service. [Citation.] The contract also called for the delivery and installation of the 'Equipment and Systems'. Since [plaintiff] was to provide 'marketable title to such Equipment and systems free and clear of any and all liens', then the 'Equipment and Systems' must be a good and not a service.

The contract calls for the delivery, assembly, installation and testing of the equipment. The contract provided that the monitors will be [calibrated] once annually. Each additional calibration shall be $2,500. [Plaintiff] agreed to provide a three year service agreement by [Megadata] free of charge.

The terms of the contract are not disputed. The hours spent developing the software are not contested. The predominate [*sic*] nature of the transaction as a whole is the sale of goods, 'Equipment and Systems'. The delivery, installation and services provided under the contract are incidental to the sale of the 'Equipment and Systems'.

This case was filed more than 4 years after the accrual of the cause of action and is barred by the statute of limitations."

Plaintiff timely appeals.

¶ 14     Plaintiff challenges the trial court's dismissal of its complaint pursuant to section 2-619 of the Code. We review *de novo* the trial court's grant of a section 2-619 motion to dismiss. *Pugsley v. Tueth*, 2012 IL App (4th) 110070, ¶ 15. The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proved issues of fact at the outset of litigation. *Pugsley*, 2012 IL App (4th) 110070, ¶ 15. The motion admits as true all well-pleaded facts and all reasonable inferences arising from those facts. *Pugsley*, 2012 IL App (4th) 110070, ¶ 15. On considering an appeal from a dismissal pursuant to section 2-619, the reviewing court must consider whether there exists a disputed issue of material fact, or, if there is no factual matter, whether dismissal is proper as a matter of law. *Pugsley*, 2012 IL App (4th) 110070, ¶ 15.

¶ 15     On appeal, plaintiff argues that the predominant purpose of the agreement was the provision of services to defendant, so the 10-year limitations period of section 13-206 of the

Code should apply rather than the 4-year period of section 2-725 of the UCC. Plaintiff also argues that, in the alternative, Mohamed's affidavit evidences the existence of disputed issues of material fact regarding the predominant purpose of the agreement, which should have precluded the dismissal of its complaint. We consider plaintiff's contentions in turn.

¶ 16 This appeal concerns whether section 2-725 of the UCC or section 13-206 of the Code should apply to the subject matter of the agreement between the parties. Article 2 of the UCC applies only to transactions in "goods" (*Nitrin, Inc. v. Bethlehem Steel Corp.*, 35 Ill. App. 3d 577, 592 (1976)), and "goods" are defined as "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale" (810 ILCS 5/2-105(1) (West 2010)). A contract for services is not a transaction in goods and is not covered by Article 2 of the UCC. *Boddie v. Litton Unit Handling Systems*, 118 Ill. App. 3d 520, 531 (1983). Where a contract mixes the sale of goods and the provision of services, the applicability of Article 2 of the UCC is determined by the " 'predominant purpose' " test. *Brandt v. Boston Scientific Corp.*, 204 Ill. 2d 640, 645 (2003). Under this test, if the contract is predominantly for goods and only incidentally for services, Article 2 of the UCC will apply. *Brandt*, 204 Ill. 2d at 645. If the contract is predominantly for services and only incidentally for goods, Article 2 of the UCC will not apply. *Zielinski v. Miller*, 277 Ill. App. 3d 735, 741 (1995). Further, the determination of the predominant purpose of a contract is usually a question of fact. *Heuerman v. B&M Construction, Inc.*, 358 Ill. App. 3d 1157, 1165 (2005). Nevertheless, the predominant purpose of a contract is also susceptible to determination as a matter of law. *Brandt*, 204 Ill. 2d at 647-48.

¶ 17 In determining whether a contract is predominantly for goods, a court will review the contractual language relating to the design, installation, or delivery of an identifiable and tangible object. *E.g.*, *Bob Neiner Farms, Inc. v. Hendrix*, 141 Ill. App. 3d 499, 501-03 (1986) (the builder provided a standardized structure and placed it on the buyer's site, and the builder was not in the business of providing individualized design and construction services; the court held this to be a contract for goods); *Yorke v. B.F. Goodrich Co.*, 130 Ill. App. 3d 220, 223 (1985) (contract called for provision of plastic pellets to make vinyl siding; the defendant provided consulting services in exchange for the plaintiff's continued purchase of pellets; the court held this to be a contract for goods); *Meeker v. Hamilton Grain Elevator Co.*, 110 Ill. App. 3d 668, 671 (1982) (contract used terms like seller and purchaser, charged a sales tax, referred to grain bins as the equipment being sold, and did not refer to the labor of the installation; court held this to be a contract for goods). With these principles in mind, we turn to the facts of this case.

¶ 18 In this case, the agreement referred to the parties as "buyer" (defendant) and "seller" (plaintiff). The object of the contract was the upgrade of tangible equipment, being components of noise-monitoring systems and radar systems. In addition, the contract provided that, "[u]pon final payment [plaintiff] shall deliver to [defendant] a Bill of Sale for the Equipment and System free and clear of any and all liens and encumbrances." We note that the UCC defines a "sale" as "the passing of title from the seller to the buyer for a price." 810 ILCS 5/2-106 (West 2010). Thus, the contract appeared by its language to contemplate a sale of goods via the passing of title from plaintiff to defendant for the equipment and systems that were the object of the agreement.

¶ 19　　　In addition, the agreement provided that plaintiff was to deliver and install the goods: plaintiff agreed to "deliver, assemble, install, test and make fully operational such Equipment and System, F.O.B." Further, "[t]he Equipment and System shall be delivered and installed F.O.B. *** with all freight and cargo to be paid by Seller." "F.O.B." is an abbreviation for "free on board," a term used in transactions in tangible goods, and is defined in the UCC. See 810 ILCS 5/2-319 (West 2010). Plaintiff also promised to provide various services "in consideration" of defendant's purchase of the equipment and systems. Thus, the terminology employed by the agreement called for the sale of goods rather than the provision of services.

¶ 20　　　This is also seen by noting that defendant was to make a single payment of $227,000 after plaintiff had delivered and installed the equipment, rather than multiple payments based on time and type of service. Further, there was no breakdown in the price between the cost of the equipment and the cost of the labor needed to make it operational. For all these reasons, then, we hold that the agreement provided for the sale of goods, with any specified services being only incidental to the sale of goods.

¶ 21　　　This can also be seen when approached from a different angle. Plaintiff supplies certain tangible widgets to buyers along with sufficient services to make the widgets operable. In the absence of the widgets themselves, the services to make them operable would be meaningless and without value. In this case, the widgets were the equipment used in the noise-monitoring and radar systems. The services were the installation of the equipment and the creation and modification of software sufficient to enable the equipment to function properly. The point of the agreement was to furnish the equipment necessary to perform the desired noise monitoring and radar detection needed to accomplish the buyer's goals of abating excessive noise from the airport. Accordingly, we hold that the trial court did not err in determining that this was a contract predominantly for goods and not services, so that the limitations period in section 2-725 of the UCC was applicable to bar plaintiff's action.

¶ 22　　　We next consider plaintiff's specific arguments. Plaintiff first criticizes the trial court's reading of *Dealer Management Systems, Inc. v. Design Automotive Group, Inc.*, 355 Ill. App. 3d 416 (2005). While plaintiff argues at length about the trial court's mistaken reading of *Dealer Management*, its argument boils down to the ultimately fruitless contention that the trial court interpreted *Dealer Management* categorically rather than conditionally. We perceive plaintiff's argument to be fruitless because we review the trial court's judgment, not its reasoning, and we may affirm that judgment on any basis supported by the record. *Hope v. Hope*, 398 Ill. App. 3d 216, 220 (2010).

¶ 23　　　In *Dealer Management*, the court had to decide whether a contract for the provision of an accounting management system was predominantly for goods or services. *Dealer Management*, 355 Ill. App. 3d at 417-18. As is pertinent here, the court noted "that courts have generally recognized that computer software qualifies as a 'good' for purposes of the UCC." *Dealer Management*, 355 Ill. App. 3d at 420. The court also noted that software occupied a continuum for the purposes of the UCC, with, on the one hand, the "ordinary sale of 'off-the-rack' software [being] a transaction in goods," and, on the other hand, "a transaction predominantly involving the intellectual property rights to the software [being] outside the scope of Article 2 [of the UCC]." *Dealer Management*, 355 Ill. App. 3d at 421. The court further noted that, similarly, "[s]ome courts have concluded that a contract to

develop entirely new software is one for services rather than goods," while "a contract that calls for the modification or customization of existing software may still be a transaction in goods" because modified or customized software is analogous to "specially manufactured" goods, which are expressly included in the UCC definition of "goods." *Dealer Management*, 355 Ill. App. 3d at 421.

¶ 24    After setting out the possibilities, the court then applied the predominant purpose test of *Brandt* to decide the issue. *Dealer Management*, 355 Ill. App. 3d at 421. In applying that test, the court considered the facts that the terminology of the contract was couched in the language of a transaction in goods, the contract provided for a sale of the software for use for an unlimited amount of time in exchange for a single payment, the contract did not suggest that any of the software was developed from scratch, and the contract amount attributable to the software was $20,000, while the amount attributable to services was $15,000, which, while not dispositive, was instructive. *Dealer Management*, 355 Ill. App. 3d at 422. After weighing the facts, the court concluded that the contract was predominantly for the sale of goods and not services. *Dealer Management*, 355 Ill. App. 3d at 422.

¶ 25    The *Dealer Management* court held that the contract at issue in that case was predominantly for goods only after analyzing the facts of the contract in light of the *Brandt* predominant purpose test and the acknowledgment that software occupies a continuum between goods and services depending on the interplay between the contract and the attendant facts. Thus, *Dealer Management* teaches that the sale of software may be a good or a service depending where upon the continuum the facts of the case fall.

¶ 26    Here, the facts and contractual language demonstrate that the transaction here was one for goods. The parties were denominated "buyer" and "seller"; title to tangible goods was passed upon completion of the contractual terms; plaintiff agreed to deliver, assemble, install, test, and make fully operational the equipment that was the subject of the contract; and defendant was to make a single payment for the equipment provided by plaintiff rather than multiple payments based on plaintiff's time and type of services provided. In addition, any services were provided "in consideration" of defendant's purchase of the equipment and systems. Considering the totality of the facts and contractual language, it is clear that this transaction falls on the goods side of the continuum, not the services side. Even if the trial court's rationale based on its reading of *Dealer Management* was incorrect, it is of no moment to our review, because the trial court still entered the correct judgment. *Hope*, 398 Ill. App. 3d at 220. Accordingly, we reject plaintiff's contention on this point.

¶ 27    Plaintiff argues that services predominated in the agreement at issue, citing a number of cases concerning mixed contracts in support of that position. These cases, however, are distinguishable or else they simply illustrate the application of the predominant purpose test. For example, plaintiff relies on *Brandt*, apparently because the item at issue, a medical sling to treat incontinence, was acknowledged to be a good under the UCC, while the entire transaction was deemed to be one for services, namely, the surgical implantation of the sling. *Brandt*, 204 Ill. 2d at 642. In evaluating the issue in *Brandt*, the court applied the predominant purpose test and noted that the application of the test usually involved considering the contractual language and assessing the proportion of goods and services in the contract. *Brandt*, 204 Ill. 2d at 652. The court noted that, according to the plaintiff's bill,

services comprised the majority of the charges, but this did not end the analysis. The court also considered the main purpose of the transaction, which was the treatment of urinary incontinence by the implantation of the sling. *Brandt*, 204 Ill. 2d at 652.

¶ 28    At best, *Brandt* is illustrative of plaintiff's point that a mixed contract may have the provision of services as its predominant purpose. It offers little guidance beyond that broad point, however. *Brandt* involves the interplay not of goods and software, but of medical goods and medical services. Plaintiff does not analogize the provision of medical goods and services to the transaction involved in this case; further, there was no written contract to be considered in *Brandt*; here, by contrast, there was a written contract the terms of which support the idea that plaintiff was providing to defendant goods sufficient to accomplish defendant's purposes. Nothing in *Brandt* compels a different result than the one we have already reached.

¶ 29    Next, plaintiff cites to *Heuerman*, 358 Ill. App. 3d at 1165, apparently for the purpose of establishing the rule that determining whether goods or services predominate in a contract is generally a question of fact. While this may be a helpful point to establish in a case involving the dismissal of an action pursuant to section 2-619 of the Code, it does nothing to contradict the cases that hold that a dispositive motion is an appropriate vehicle for settling a case involving a mixed goods and services contract. In this case, we have determined that the trial court correctly resolved the issue as a matter of law.

¶ 30    In addition, the *Heuerman* court's analysis focuses on the terms of the contract. The case involved a contract for the procurement, hauling, and delivery of gravel to a road improvement project. *Heuerman*, 358 Ill. App. 3d at 1159. The court noted that the contract specified where the loads of gravel were to be placed and the type of vehicle that would be used to convey the loads and that the terminology of the contract did not conform to a sale of goods, because it denominated the plaintiff by its proper name and the defendant as the "customer." Based on these considerations, the court concluded that the contract was predominantly for the service of hauling and not for the procurement of the good, gravel. Additionally, the court noted that two-thirds of the contract amount was devoted to hauling, and one-third arose from the sale of the gravel.

¶ 31    In this case, the trial court analyzed the terms of the contract in determining that it was for the provision of goods. The trial court, then, actually followed the guidance in *Heuerman*, namely, to carefully consider the terms of the contract. As to plaintiff's point about *Heuerman*, that it stands for the proposition that the predominant purpose test presents a factual question, we disagree that it does for this case. *Heuerman* stated only that the predominant purpose test *generally* presents a question of fact (*Heuerman*, 358 Ill. App. 3d at 1165), suggesting that there are times when the predominant purpose test may be disposed of on a motion to dismiss or a motion for summary judgment; other authority squarely holds that the predominant purpose test may be resolved as a matter of law (see, *e.g.*, *Brandt*, 204 Ill. 2d at 647-48). Thus, the resolution of the predominant purpose test will depend upon the circumstances of the case. In this case, we have concluded that it could be resolved as a matter of law, and *Heuerman* does not change that conclusion. Additionally, *Heuerman* supports our consideration of the terms of the contract as an important, if not by itself wholly conclusive, part of the analysis to be used in the predominant purpose test. Plaintiff's reliance

on *Heuerman*, then, is unavailing.

¶ 32    Plaintiff next cites five cases that, it asserts, are sufficiently factually similar as to provide guidance in determining that the predominant purpose of the agreement was the provision of services by plaintiff to defendant. We briefly consider each case in turn.

¶ 33    Plaintiff first cites *Lukwinski v. Stone Container Corp.*, 312 Ill. App. 3d 385 (2000). In that case, the driver of a delivery truck was injured when packaging for boxes he was delivering to the customer failed. *Lukwinski*, 312 Ill. App. 3d at 386-87. The driver sought to claim the benefit of the warranty of merchantability pursuant to Article 2 of the UCC, but the court concluded that the driver's relationship to the box maker was solely as a provider of services, namely, delivering the boxes to the box maker's customers. *Lukwinski*, 312 Ill. App. 3d at 389. The court further held that the driver was not a third-party beneficiary of the sales contract between the box maker and the customer. *Lukwinski*, 312 Ill. App. 3d at 391.

¶ 34    We hold that *Lukwinski* is distinguishable. In that case, there was no mixed contract between the plaintiff and the defendant. Rather, the contract was between the plaintiff's employer and the defendant, and it was a contract for services, namely, hauling goods to be delivered. The contract that the plaintiff attempted to benefit from was between the defendant and the defendant's customer, so the plaintiff was actually outside of the contract that was under the scope of Article 2 of the UCC. Here, by contrast, the contract was between plaintiff and defendant and was a mixed contract. *Lukwinski* is inapposite and provides no guidance in the circumstances of this case.

¶ 35    Plaintiff next cites *Zielinski*, 277 Ill. App. 3d at 738, in which a homeowner sought to recover for interior-use-only bricks being used on the exterior of his house. In considering the viability of the homeowner's complaint against a third-party defendant, the mason who contracted to provide and install the bricks, the court held that "masonry subcontracts of this sort are not primarily contracts for the sale of goods." *Zielinski*, 277 Ill. App. 3d at 741. Regarding the brick manufacturer, the court concluded that it provided only goods and no services. *Zielinski*, 277 Ill. App. 3d at 743.

¶ 36    We conclude that *Zielinski* is also distinguishable. The party in *Zielinski* who most closely resembles plaintiff in this case is the mason. The *Zielinski* court, however, did not provide any express analysis of the contract. Instead, it noted that "masonry subcontracts" of the kind at issue there were "not primarily contracts for the sale of goods." *Zielinski*, 277 Ill. App. 3d at 741. That statement represents the sum and total of the court's analysis regarding the contract at issue. By contrast, here, the trial court at least alluded to the proper analysis and the contractual terms. In addition, the trial court actually followed the example of *Zielinski* by finding a representative case, here, *Dealer Management*, and following it. Thus, if anything, *Zielinski* supports the trial court's analysis. We find plaintiff's reliance on *Zielinski* to be misplaced.

¶ 37    In *Boddie*, 118 Ill. App. 3d at 531, the issue pertinent to this case was whether the contract was for goods or services. The court analyzed the terms of the contract, noting that it required the defendant to complete construction of a building, complete alterations and modifications of the building, construct exterior utilities, perform excavation and construction work in fabricating caissons, construct lookout galleries, and furnish and install

a conveyor system. The court further noted that the contract styled itself as a " 'Construction Contract.' " *Boddie*, 118 Ill. App. 3d at 531. The court held that "[s]uch general construction contracts encompassing the erection of buildings, the installation of utilities and services, with extensive excavation and demolition, have as their primary thrust the rendition of services rather than the sale of goods." *Boddie*, 118 Ill. App. 3d at 531.

¶ 38     *Boddie* is also distinguishable. While the contract at issue called for the defendant to supply and install a conveyor system, it also contained many further requirements regarding the construction of the building in which the conveyor was to be placed. Thus, the *Boddie* court contemplated the contractual terms before determining whether goods or services predominated. The contract at issue in *Boddie* appears to have been much more extensive than the one in this case, and the provision of the conveyor system appears to have been a small part of the defendant's overall obligations. Here, by contrast, the contract focused exclusively on the noise-monitoring and radar equipment and systems to be used in monitoring flights at the O'Hare airport. The scope of the contract in this case was narrower, and it was much less clear in the division between goods and services. Further, *Boddie* appeared to follow the analysis in *Zielinski* because it generalized a class of contracts, namely, construction contracts. Thus, while the result in *Boddie* is the same that plaintiff is looking for in this case, the rationale actually supports the trial court's decision. It considered the terms of the contract in determining whether goods or services predominated and it used a generalization from a similar case to underpin its result, much as the trial court in this case analyzed the agreement and relied on *Dealer Management*. In any event, we do not believe that *Boddie* is particularly helpful given that it involved a contract in which the provision of goods was clearly a small part, while the contract here was of a smaller scope than the construction of a building and focused on the noise-monitoring and radar equipment and systems.

¶ 39     In *Nitrin*, 35 Ill. App. 3d at 592, the defendant, a general contractor, claimed that its status as a general contractor removed it from the ambit of the implied warranties imposed by the UCC. The plaintiff argued that the fact that the contract between it and the defendant called for the defendant to perform services did not remove the contract from the purview of the UCC, and the fact that the defendant was to "furnish" everything necessary to complete the construction of an ammonia plant meant that it was selling goods like the converter vessel used to create the plant's ammonia product. *Nitrin*, 35 Ill. App. 3d at 593. The court carefully reviewed the contract and determined that it was for services, because it denominated the plaintiff as the owner and not the buyer, and the defendant as the contractor and not the seller; the contract called for the defendant to design and engineer the plant, but it did not call for the defendant to sell anything to the plaintiff; and last and importantly, purchasing decisions were the plaintiff's, and the title to the machinery, equipment, and supplies for the work resided in the plaintiff so that the defendant never had any title to the converter, even though the plaintiff attempted to maintain that the defendant had sold it the converter under the contract. *Nitrin*, 35 Ill. App. 3d at 594-95.

¶ 40     *Nitrin* used the same procedure to effect the analysis of its contract as the trial court and we used in this case, namely, a review the contract to discern its purpose. In the agreement at issue in this case, the parties denominated themselves as buyer and seller. Items in the

contract were sold from the seller to the buyer, not built in place or designed as in *Nitrin*. Further, the agreement called for the transfer of title from the seller-plaintiff to the buyer-defendant in this case; in *Nitrin*, the defendant never had title to anything, and title to all equipment, including the disputed converter, remained in the plaintiff. These factual differences in the contractual language serve to distinguish *Nitrin* from this case. The overall analytical scheme followed by the court in *Nitrin* is the one we have endeavored to explain and follow; that is the main point of relevance of *Nitrin*. Due to the differences in the contractual language, there is little factual similarity between *Nitrin* and this case. Accordingly, we conclude that *Nitrin* is inapposite.

¶ 41 Plaintiff last points to *Continental Illinois National Bank & Trust Co. v. National Casket Co.*, 27 Ill. App. 2d 447 (1960), which involved a contract for the manufacture and installation of a steel marquee on the defendant's building. The court stated, "[t]he contract here was not for the sale of goods. It was for the manufacture and installation of a marquee on the defendant's building." *Continental Illinois*, 27 Ill. App. 2d at 455. The quoted passage is the extent of the discussion of whether goods or services predominated in the transaction. Indeed, there was no mention in the case of an issue turning on whether the plaintiff had sold goods or services to the defendant. *Continental Illinois* offers nothing to illuminate the issues of this case. We determine *Continental Illinois* to be inapposite.

¶ 42 Plaintiff cited the foregoing cases for the purpose of illustrating how courts analyze mixed contracts under the UCC. Our review of the cases shows that they are either factually distinct or otherwise inapposite, except for their general approach to analyzing the issue. Both we and the trial court below followed this general analytical framework. Accordingly, to the extent that plaintiff relies on *Lukwinski*, *Zielinski*, *Boddie*, *Nitrin*, and *Continental Illinois*, that reliance is unavailing. The cases do not change our analysis above.

¶ 43 Next, plaintiff turns to specific disagreements with the trial court's judgment and defendant's arguments below (which, presumably, the trial court accepted in reaching its judgment). Plaintiff complains that defendant, in its arguments below, devoted "substantial time" to the agreement while "ignoring the 'predominate nature of the transaction as a whole.' " In particular, plaintiff objects to defendant's argument that the contractual language " 'implie[d]' " a sale of goods because, according to plaintiff's synopsis of the argument, the agreement referred to plaintiff as the seller and defendant as the buyer. Plaintiff contends that " 'the labels used by the parties to describe the transaction are not controlling' " (quoting *Dealer Management*, 355 Ill. App. 3d at 422). We perceive plaintiff's point to be that defendant (and the court) did not actually consider the agreement and the transaction as a whole, but relied on buzz words, like buyer and seller, to conclude that the transaction was primarily for goods with the services being incidental. We disagree.

¶ 44 Plaintiff correctly cites *Dealer Management* for the proposition that the parties' labels will not control the court's interpretation of a transaction. Plaintiff, however, overstates the point, attempting to imply that the parties' labels are actually worthless in determining the predominant purpose of a transaction. There is no support for that position. Instead, the parties' labels are data to use in determining the predominant purpose of the transaction, just as the relative breakdown of costs between the goods and services in a mixed contract is useful information, but not dispositive on its own. *Dealer Management*, 355 Ill. App. 3d at

421-22 ("Comparing the relative costs of materials and labor may be helpful in the analysis, but is not dispositive.").

¶ 45    Plaintiff contends next that the "Agreement itself contains myriad terms devoted to prescribing [plaintiff's] Services." While this may be a true statement (albeit vague), it begs the question as to whether goods or services predominate in the transaction at issue here. "Myriad" simply means many, and the employment of that term does nothing to help quantify the terms that prescribe the goods to be supplied under the agreement or the relative importance of the goods versus the services in the transaction. Further, our review of the agreement and the transaction indicates that goods predominate notwithstanding the "myriad terms" used in the agreement to prescribe the services to be provided. In addition, we believe that plaintiff is conflating systems specifications, meaning what functions the agreement's "Equipment and System" will perform, with the services plaintiff is to perform under the agreement. Accordingly, we reject plaintiff's "myriad terms" contention.

¶ 46    Plaintiff criticizes the trial court for failing to consider the "transaction as a whole." *Brandt*, 204 Ill. 2d at 652. In support, plaintiff refers to the Mohamed affidavit as illustrative of the many services that it was to perform in the transaction. We reject plaintiff's criticism on this point. Our review of the transaction demonstrates that its primary purpose was the sale of the goods comprising the noise-monitoring and radar equipment and systems. The services to fine-tune the goods to perform their jobs, while apparently extensive, were nevertheless incidental in this transaction. As we have already noted, the trial court's reasoning reflected in its order is not what is on appeal; rather, the trial court's judgment is at issue in this appeal. *Hope*, 398 Ill. App. 3d at 220. Even if the trial court did not consider the transaction as a whole, it arrived at the correct judgment even as it employed flawed reasoning. We therefore do not disturb the trial court's judgment.

¶ 47    Last, plaintiff highlights the fact that some of the software was original and some was customized for the equipment and systems of the agreement. While true, that fact does not transform the transaction from one for goods into one for services. As we have noted, the services were incidental to the sale of the equipment and systems. We note, however, that simply because the services were incidental does not mean that they were not necessary. Plaintiff is conflating the idea of necessary with the thrust of the transaction. Indeed, without the goods (the noise-monitoring and radar equipment), the software would have been wholly without function or purpose (and likely could not have been developed). Likewise, without the software, the equipment would not function as desired. The necessity of both goods and services is manifest, but the necessity does not determine the predominant nature of the transaction. A review of the circumstances and the agreement demonstrates that the goods predominate in this transaction, notwithstanding the necessity of the services to make the goods function as required. We reject plaintiff's final contention on this point.

¶ 48    We have carefully reviewed the transaction between the parties to determine whether the goods aspect or the services aspect of the transaction was predominant. The authority we have reviewed emphasized the importance of reviewing the terms of the agreement in determining the predominant nature of the transaction in the procedural posture of this case. Our review indicated that the transaction was predominantly for the sale of goods, namely, noise-monitoring and radar equipment and systems, with the services, namely, software

-13-

development and customization, incidental to that purpose. Plaintiff's arguments to the contrary are unavailing. Accordingly, we hold that the trial court correctly determined that the UCC's statute of limitations in section 2-725 (810 ILCS 5/2-725 (West 2010)) applied to the transaction, and that plaintiff's action was time-barred as a result. Thus the trial court properly granted defendant's motion to dismiss.

¶ 49    Next, and in the alternative, plaintiff argues that Mohamed's affidavit, which defendant did not oppose by filing a counteraffidavit, demonstrated the existence of a material factual dispute that should have precluded the grant of defendant's motion to dismiss. Plaintiff's argument is fairly simple: The law says that an unopposed affidavit may demonstrate the existence of an issue of material fact (plaintiff says "create" an issue of material fact), and this occurs when reasonable minds viewing the uncontradicted affidavit might differ about the inferences to be drawn from the undisputed evidence. *Pothier v. Chicago Transit Authority*, 238 Ill. App. 3d 702, 704 (1992). Mohamed submitted an affidavit that was attached to plaintiff's response to defendant's motion to dismiss. Defendant did not file a counteraffidavit seeking to oppose Mohamed's affidavit. Mohamed's affidavit contains myriad facts about the services that plaintiff agreed to perform in this transaction. Because Mohamed's affidavit contains facts, and because it was unopposed, the court had to accept as true the averments in the affidavit, and, as a result, the court should have determined that there existed an issue of material fact that should have been heard by a jury (since plaintiff requested a jury trial).

¶ 50    While plaintiff's logic is largely correct, it is deficient in at least one key aspect, which is seen by the terms it uses. The crux of plaintiff's argument is that the unopposed affidavit *creates* an issue of material fact. This is simply incorrect. See *American States Insurance Co. v. National Cycle, Inc.*, 260 Ill. App. 3d 299, 305 (1994) (affidavit, even though unopposed, did "not create a question of [material] fact" where the affidavit conflicted with judicial admission in the defendant's answer to the plaintiff's complaint); *Yusuf v. Village of Villa Park*, 120 Ill. App. 3d 533, 541-42 (1983) (the plaintiffs' affidavit, even though unopposed, did not warrant summary judgment where the affidavit did not resolve an issue of material fact). Mohamed's affidavit cannot create an issue of fact, but it may illuminate the existence of an issue of fact. Moreover, even if the affidavit were to demonstrate the existence of a factual issue, that may still be insufficient to prevail, as plaintiff must demonstrate the existence of an issue of *material* fact to preclude the dismissal of its complaint pursuant to section 2-619 of the Code. *Thurman v. Champaign Park District*, 2011 IL App (4th) 101024, ¶ 18. Accordingly, we need to review Mohamed's affidavit with an eye toward discerning whether any factual averments (as distinct from conclusory averments) reveal the presence of a disputed issue of material fact that needs to be resolved by the finder of fact.

¶ 51    We first recap: The issue facing the court is whether the statute of limitations in section 2-725 of the UCC (810 ILCS 5/2-725 (West 2010)) bars plaintiff's complaint as untimely. In order to resolve the issue, the court must apply the predominant purpose test. *Brandt*, 204 Ill. 2d at 645. Thus, in order to prevail, Mohamed's affidavit must contain facts revealing the existence of a disputed factual issue over whether goods or services predominate in the contract.

¶ 52    Plaintiff contends that Mohamed's affidavit gives details of the engineering services he

and two others provided pursuant to the agreement. Defendant counters that the affidavit only restates the requirements and parameters called for in the agreement. We agree with defendant. For example, paragraph 5 of Mohamed's affidavit restates the goal of the agreement. Paragraph 6 recapitulates the performance requirements set forth in Exhibit A to the agreement. Paragraph 7 sets forth the parameters regarding flight data, arrivals and departures, and voltage reports from the noise-monitoring equipment. Paragraphs 9 through 12 discuss the development of the software to perform the functions identified in paragraphs 5 through 7.

¶ 53    In particular, Mohamed noted that the development of new software and customization of existing software took a total of 161 days (presumably meaning person-days of labor among the three engineers on the project). Mohamed provided a threefold categorization of the software tasks: new software, customized software, and combined new and customized software, but did not elaborate on what tasks each category represented. We believe that the "new software" category means creating software that did not previously exist; "customized software" means changing an existing piece of software to conform to the requirements of the agreement; and "new and customized software" means some sort of combination of the two, either changing existing software to provide new output, or the concurrent development of new software and the changing of existing software. Mohamed's chart shows that 52 days were spent on new software, 37 days were spent on customizing software, and 72 days were spent on combined new and customized software. Only 52 days of the 161 were spent on developing new software; the remaining time was spent customizing existing software in some fashion. (We note that customization of existing software may be akin to creating specially manufactured goods under the UCC. *Dealer Management*, 355 Ill. App. 3d at 421.) Thus, customization predominated over the development of software.

¶ 54    Mohamed's affidavit, then, focuses on various forms of software development. It also assumes, without establishing, that such software development is a service and not a good. In *Dealer Management*, the court noted that software could be either a good or a service, depending on the circumstances of the transaction. *Dealer Management*, 355 Ill. App. 3d at 421. Its example for software constituting a service included a transaction predominantly involving the intellectual property rights to the software, or the development of entirely new software. *Dealer Management*, 355 Ill. App. 3d at 421. However, modifications of software (such as customization), and services associated with the sale of hardware, like installation, training, and technical support, typified software constituting a good. *Dealer Management*, 355 Ill. App. 3d at 421. Mohamed's affidavit shows that the majority of time was spent on customization of software and technical support. These activities, while apparently extensive, are still associated more with the software constituting a good rather than a service. Mohamed's affidavit, then, establishes to a greater degree that the software development was more like that associated with the sale of hardware, namely, customization and technical support. Accordingly, we do not see where any of the factual averments in Mohamed's affidavit demonstrate the existence of a disputed factual issue. Rather, the averments suggest and support our reading of the agreement and our understanding of the transaction as predominantly one for the sale of goods and not the provision of services.

¶ 55    Plaintiff particularly emphasizes paragraphs 14 through 16 of Mohamed's affidavit, in

which he opined that, without the development and customization of the software, the equipment would be worthless. Plaintiff argues that, because the hardware manifestly would be worthless without the software developed to run it, the agreement must have been one predominantly for services, focusing on that software development. We see at least two major problems with this line of reasoning. First, the statements are conclusory, not factual. Because these statements are not factual, they cannot demonstrate the existence of a factual dispute. Second, and at least as important, the converse is equally true: without the hardware, the software would be irrelevant. Indeed, without the hardware, it is likely that the software could not have been developed and customized at all. The averments in paragraphs 14 through 16, then, cannot realistically serve as the lynchpin of plaintiff's arguments about the affidavit.

¶ 56 Based on our careful review of Mohamed's affidavit, we conclude that it does not establish that a disputed issue of material fact exists that should have been resolved by the jury. The affidavit recapitulates the terms of the agreement identifying the performance standards expected of the equipment and systems. The focus on software development shows that it is more in the nature of goods than services. Additionally, the affidavit includes nonfactual information that contributes nothing to the search for a factual dispute. Based on these reasons, we hold that the Mohamed affidavit does not demonstrate that there exists in this case a disputed issue of material fact.

¶ 57 We now turn to plaintiff's specific arguments. Plaintiff first argues that an uncontradicted affidavit may create a factual issue. We have above debunked plaintiff's reasoning. It is not the function of an affidavit to create an issue; rather, the affidavit helps the court to visualize an existing issue. *American States Insurance*, 260 Ill. App. 3d at 305; *Yusuf*, 120 Ill. App. 3d at 541-42.

¶ 58 Plaintiff next suggests that *Pothier* supports the idea that an uncontradicted affidavit may establish factual questions. In that case, the plaintiff's affidavit set out facts supporting her defense of estoppel against the defendant's motion to dismiss based on the plaintiff's failure to file a notice of accident with the defendant. *Pothier*, 238 Ill. App. 3d at 705. The difference between that case and this case is that Mohamed's affidavit does not set forth facts showing that the parties wished to conduct a transaction in services; rather, the averments support the view that the transaction was predominantly for a sale of goods.

¶ 59 Plaintiff further cites to *Janowiak v. Tiesi*, 402 Ill. App. 3d 997 (2010), *Lopez v. Clifford Law Offices, P.C.*, 362 Ill. App. 3d 969 (2005), and *Searcy v. Chicago Transit Authority*, 146 Ill. App. 3d 779 (1986), all for the same proposition as *Pothier*, that an uncontradicted affidavit may reveal the existence of a factual issue that would preclude the grant of a defendant's motion to dismiss. As we noted for *Pothier*, we distinguish *Janowiak*, *Lopez*, and *Searcy* in the same fashion: in those cases, the affidavit set forth facts relevant to the particular defense each plaintiff raised to defeat the defendant's motion to dismiss. By contrast, here, Mohamed's affidavit does not set forth facts demonstrating the existence of a factual issue concerning whether the transaction was predominantly for the sale of goods or the provision of services. Thus *Janowiak*, *Lopez*, and *Searcy* are all distinguishable.

¶ 60 Next, plaintiff returns to the idea that the predominant purpose test generally presents a

question of fact to be resolved by a jury. We have addressed this issue above, noting that it is well settled that the predominant purpose test may be resolved as a matter of law in the appropriate circumstances, and determining that those circumstances are present in this case. *Brandt*, 204 Ill. 2d at 647-48.

¶ 61 Next, plaintiff attempts to distinguish *Dealer Management* and show that the trial court's reliance on it was misplaced. We discussed this above, noting that, even if the trial court misread and overplayed *Dealer Management*'s holding, its judgment was still correct. We need not consider further plaintiff's contentions regarding *Dealer Management*.

¶ 62 Plaintiff also criticizes the trial court's focus on the three years of free services that Megadata was to perform. Plaintiff contends that this was a key consideration leading to the trial court's judgment. Once again, even if this were so, and even if it constituted erroneous reasoning on the trial court's part, the trial court arrived at the correct result, so we need not consider it further. *Hope*, 398 Ill. App. 3d at 220 (the appellate court reviews the trial court's judgment, not its reasoning).

¶ 63 Accordingly, for the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

¶ 64 Affirmed.