In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2324

IN RE: ARTURO COLLAZO,

*Debtor.*

DANA SIRAGUSA, *et al.*,

*Plaintiffs-Appellants,*

*v.*

ARTURO COLLAZO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 5008 — **Jorge L. Alonso**, *Judge.*

ARGUED JANUARY 21, 2016 — DECIDED APRIL 5, 2016

Before POSNER, EASTERBROOK, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.* Arturo Collazo was (maybe still is)
a real estate developer engaged in buying apartment build-

ings, mainly although not exclusively in Chicago, and converting the apartments to condominiums that he and his partner, Jon Goldman, would then sell. In 2012 Collazo petitioned for bankruptcy, seeking to discharge his debts to, among others, Dr. Robert J. Siragusa (a physician), Siragusa's employee benefit trust, and Siragusa's three adult children. All five Siragusas joined in filing an adversary action in the bankruptcy proceeding, contending that Collazo was not entitled to a discharge of his debts to them. The bankruptcy judge, however, seconded by the district judge (to whom the Siragusas appealed the adverse rulings of the bankruptcy judge on their claims), allowed all but one of the Siragusas' claims to be discharged. All the Siragusas except daughter Julie appeal to us. The one claim the bankruptcy and district judges held not to be discharged is Collazo's debt to two of Dr. Siragusa's children, Dana and Robert Joseph, concerning a development project in Arizona. Collazo has not appealed that ruling.

Collazo's modus operandi was to make the nominal owner of each building that he bought a separate LLC owned by Goldman and himself. To finance the conversion of the apartments in the buildings to condos the partners would borrow money from financial institutions and provide security for the loans by mortgaging the properties. But because the lenders were slow to release funds to the partners for their Chicago construction projects, the partners needed short-term financing as well. Daughter Julie happened to work for Collazo and in 2002 she introduced her father to him. Joined by his trust and later by all three children, Dr. Siragusa began making loans to Collazo to help him finance his real estate projects. Collazo promised to repay each loan as soon as he repaid any long-term lenders,

and in addition to pay interest to the Siragusas at an annual rate of 17 to 20 percent. In 2002 and 2003 Dr. Siragusa, the trust, and another daughter, Dana, lent Collazo a total of $830,000 for Chicago conversion projects. (Siragusa's other two children were not parties to these loans.)

Beginning in 2003 and continuing until 2005, Collazo transferred the unsold condo units in the Chicago buildings to other LLCs formed by him and Goldman, and pledged the units as security for additional loans that the partners obtained to help finance their conversion projects. According to the Siragusas, the new lenders didn't realize that Collazo was indebted to Dr. Siragusa, daughter Dana, and the trust for their having financed the acquisition of the properties; the transfer of the units had made the units appear unencumbered by any preexisting debts.

Collazo testified in the bankruptcy proceeding that he had not intended to transfer unsold condo units when he had borrowed money from the Siragusas years earlier. But if so his intentions changed, for by mid-2005 he had not only transferred all the unsold condo units in the Chicago buildings in which the Siragusas had invested; he had also mortgaged all of them in order to obtain additional funds. He had repaid only some of the money he'd borrowed from the Siragusas, and such repayments as he had made had been tardy. Though unaware of the transfers and subsequent mortgaging of the unsold condo units, Dr. Siragusa was sufficiently alarmed by Collazo's delays in repayment to seek an update from him. Collazo responded by assuring him that the delays were attributable to construction delays that were beyond his ability to prevent. For quite a long time Siragusa was satisfied with this response.

In November 2005 Collazo, though he'd still not fully re-
paid the Siragusas' loans, asked them to invest in a large de-
velopment project in Arizona. He assured them that their
Chicago loans would be repaid as soon as the final condo
units were sold, which he told them he expected within 30 to
60 days. He didn't tell them he'd transferred the unsold Chi-
cago units to LLCs controlled by him that had in turn taken
out loans secured by the transferred units, and that the lend-
ers might have rights to the properties (which were now
their collateral) that were superior to the Siragusas' rights, in
which event repayment of the Siragusas' loans might be im-
possible. Yet on the basis of Collazo's misleading representa-
tions, Dr. Siragusa's trust and all three children invested a
total of $1 million in the Arizona project. The borrowing en-
tity, CG Development, agreed to repay them with interest at
an annual rate of 20 percent; yet CG never bought the prop-
erty. Another entity controlled by Collazo did, and it had no
legal obligation to the Siragusas—who unsurprisingly were
never repaid.

The Bankruptcy Code "does not discharge an individual
debtor from any debt … for money … to the extent [it was]
obtained by … false pretenses, a false representation, or ac-
tual fraud." 11 U.S.C. § 523(a)(2)(A). But the Illinois statute
of limitations for "all civil actions not otherwise provided
for," 735 ILCS 5/13-205, including fraud claims, *McCarter v.
State Farm Mutual Auto. Ins. Co.*, 473 N.E.2d 1015, 1018 (Ill.
App. 1985), is only five years, and the bankruptcy judge, se-
conded by the district judge, ruled that the period had ex-
pired with respect to Dr. Siragusa's and his trust's claims be-
fore the filing of the adversary action. The statute of limita-
tions applicable to fraud claims begins to run when the
claimant discovers or should have discovered that he has

been injured by a wrongful act. *Knox College v. Celotex Corp.*, 430 N.E.2d 976, 979–80 (Ill. 1981). The judges ruled that Dr. Siragusa should have discovered the fraud in July 2007, which meant that the statute of limitations had expired in July 2012—four months before Collazo declared bankruptcy and sought discharge of his debts to the Siragusas and seven months before they filed their adversary action against him.

In July 2007 Siragusa had been told by his daughter Julie—remember that she worked for Collazo—that a Chicago condo unit in one of the buildings in which the Siragusas had invested had just been sold. It was the last unit to be sold in that building, and Collazo had made no payment on the loan. This should have been a red flag to Julie's father, since he'd been told by Collazo almost two years earlier that *all* the Chicago units that the Siragusas had invested in would probably be sold within 30 to 60 days—that was the representation that had induced them to make a series of large loans to Collazo's conversion project in Arizona. The conversation with his daughter should have alerted Dr. Siragusa to a substantial probability that his loans to Collazo for both the Chicago and Arizona projects would never be repaid in full and perhaps had never been intended to be repaid, though he'd been assured of prompt repayment and the promissory notes that Collazo had given him had required payment upon the consummation of each sale of a condo unit.

Siragusa recognized the potential significance of the sale that his daughter had told him about, telling her "that's one of the buildings I'm invested in. You have to tell me when these sell." Had he followed up on the conversation by commissioning title searches on the Chicago properties on

which he and his trust and his daughter Dana had made loans, he would have realized that Collazo had disabled the companies of his that owed the debts from paying them; he had done this by transferring the properties to LLCs that had no contractual obligations to the Siragusas.

Yet after the conversation with his daughter Siragusa did ask Collazo for an accounting, and received it in October 2007. But Collazo told him a sad tale of construction delays (without any specifics) that were delaying the sale of the condo units, and gave empty assurances of prompt repayment that were not backed up by any documents.

In 2009 Collazo proposed a settlement of his obligations to the Siragusas, and it was then that they started investigating and discovered that the entities to which they'd lent money were assetless. Yet they took no legal action at that time, and discussion of Collazo's settlement proposal had made no progress when he declared bankruptcy more than three years later.

A reasonable investor in Dr. Siragusa's position would have investigated much earlier, and sued much earlier; and the applicable Illinois statute of limitations begins to run not when the injured person discovers that he is the likely victim of a wrongful act but when a reasonable person in his shoes would have discovered it. See *Knox College v. Celotex Corp.*, *supra*, 430 N.E.2d at 979–81; *Wells v. Travis*, 672 N.E.2d 789, 793 (Ill. App. 1996); *Joyce v. Morgan Stanley & Co.*, 538 F.3d 797, 803 (7th Cir. 2008) (Illinois law).

The foregoing analysis applies as well to the trust's Arizona loans, which Siragusa had been induced to make by Collazo's assurance that the Chicago loans would be repaid

in 30 to 60 days. Upon discovering that they would not be repaid, a reasonable person in Siragusa's position would have begun to worry that his Arizona loans might not be repaid either, and to investigate, and the investigation would have revealed that an entity other than the borrowing entity had purchased the Arizona property. He did not investigate.

We agree with the bankruptcy and district judges that the claims of Dr. Siragusa and his trust (but not the claims of the two Siragusa children, Dana and Robert Joseph, who are also appellants) were time barred. It's true that the Siragusas might have argued—though did not—that the debts to them had arisen from the loan contracts (i.e., the promissory notes) rather than from Collazo's fraud. They would have been appealing to the principle that there are "two distinct issues in a nondischargeability proceeding. The first, the establishment of the debt itself, is governed by the state statute of limitations—if suit is not brought within the time period allotted under state law, the debt cannot be established. [But] the question of the dischargeability of the debt under the Bankruptcy Code is a distinct issue governed solely by the limitations periods established by bankruptcy law." *In re McKendry*, 40 F.3d 331, 337 (10th Cir. 1994); see also *Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 868 (9th Cir. 2001); *In re Gergely*, 110 F.3d 1448, 1453–54 (9th Cir. 1997). The relevant limitations period therefore depends on whether the Siragusas are charging fraud or breach of contract.

One might think the debts to the Siragusas arising from Collazo's shenanigans had actually arisen from the promissory notes, making the limitations period the ten-year period applicable to claims based on written contracts, 735 ILCS 5/13-206, which is twice the length of the limitations period

for fraud claims. But the Siragusas have not argued that the debt to them arises from the contracts, and can't, because Collazo, the only defendant in the adversary action, was not a party to the promissory notes. Only his LLCs were, and in Illinois "the debts, obligations, and liabilities of a limited liability company … are solely the debts, obligations, and liabilities of the company"; a member of the LLC "is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager." 805 ILCS 180/10-10(a). The word "solely" suggests a possible escape hatch for the Siragusas, but they have failed to present any veil-piercing theory that would make Collazo liable under the promissory notes, leaving them to argue only that he fraudulently induced them to give him money, thus tying them to the five-year statute of limitations applicable to fraud claims. They could have sued the LLCs, which were the signatories of the promissory notes, for breach of contract, but probably the LLCs were judgment proof, because Collazo had transferred their assets.

Unlike the claims of Dr. Siragusa and his trust, the fraud claims of his daughter Dana and his son Robert Joseph are not time barred. For there is no evidence that they knew or were on notice of any transfers of the Chicago condo units before January 2009, when Collazo proposed settlement negotiations. But the bankruptcy judge ruled that Collazo had not, at the time he received the loans from the Siragusas, decided to transfer the unsold Chicago units. His intention to do so may have been formed later, though neither judge addressed that question. Yet the district judge noted that Collazo had paid back some of the Chicago loans even after transferring all the condo units from the LLCs that owned the buildings containing the units to other LLCs controlled

by him. But even if he hadn't intended to defraud the Siragusas when he obtained the Chicago loans, that didn't get him off the hook. For he'd committed fraud when he'd told the Siragusas that he expected the loans they'd made to him would be repaid in 30 to 60 days. He'd made this promise knowing they wouldn't be repaid within that interval (if ever)—made it in order to induce the Siragusas to lend him more money. That was fraud because the inducement for the loan was the lie about when the Chicago loans would be repaid. And so the bankruptcy judge refused to discharge Collazo's debts to Dana and Robert Joseph that were related to the Arizona project.

Dana has appealed the decision to discharge the debt owed her on the Chicago loans, contending that Collazo's false statements about his business induced her to lend money, and noting testimony by Goldman that it was the partners' practice to move condo units into new LLCs in order to render them judgment-proof. But Goldman also testified that they did this only when the condo units hadn't sold by the time the construction project was completed. The bankruptcy judge was entitled to find that no fraudulent representation had been made earlier, when the debt was incurred.

The bankruptcy judge also rejected Dana's claim that Collazo had committed fraud when he transferred the Chicago condo units to new LLCs. (Dana was the only one of the Siragusa offspring who had invested in those units.) The judges assumed that to constitute fraud under 11 U.S.C. § 523(a)(2)(A) a debtor's false representation must induce the creditor to part with money or property. Dana contends that Collazo committed fraud when he transferred condo units to

new LLCs, since the fraud exception to a discharge in bankruptcy encompasses a debtor's transferring valuable property in order to keep it out of the hands of the creditors entitled to it. *McClellan v. Cantrell*, 217 F.3d 890, 894–95 (7th Cir. 2000). That may have happened in this case; Collazo may have "rendered the debt uncollectible by making an actually fraudulent conveyance of the property that secured it," and if so "his actual fraud [gave] rise to a new debt, nondischargeable because created by fraud." *Id.* at 895; see also *In re Lawson*, 791 F.3d 214, 218–22 (1st Cir. 2015). The question whether, as we held in the *McClellan* case, there can be a fraud without a fraudulent statement (for the fraud we're discussing is a silent transfer of property rather than a lie) is now before the Supreme Court in *Husky International Electronics, Inc. v. Ritz*, No. 15-145, argued on March 1 of this year. Should the Court agree with our analysis in the *McClellan* case, Dana will be entitled on remand to resuscitate her fraud claim.

One issue remains to be discussed. The bankruptcy court, again seconded by the district court, refused to enter a money judgment against Collazo even though both courts had concluded that his debts to Dana and Robert Joseph with respect to the Arizona project were nondischargeable, hence still enforceable, because they'd been obtained by fraud. If a claim is not discharged in bankruptcy but there are no assets in the estate to distribute to the creditor and therefore the debt is still owing, the claimant is free to seek damages against the debtor under the applicable state law defining a creditor's rights. Presumably the aim would be to obtain the damages from the future earnings of the bankrupt debtor, earnings not included in the estate in bankruptcy. The bankruptcy judge was uncertain, however, whether *he* had consti-

tutional and statutory authority to enter a money judgment in a case governed by state law. *Stern v. Marshall*, 131 S. Ct. 2594 (2011), had held that a bankruptcy judge had no authority to enter final judgment on the debtor's state law counterclaim against a creditor. Uncertain about the application of *Stern* to the present case (which of course does not involve a counterclaim), the bankruptcy judge thought the counsel of prudence was to decline to proceed to judgment. He could have declined to award damages and instead remitted the creditors (Dana and Robert Joseph) to their state-court remedies, see *In re Sasson*, 424 F.3d 864, 874 (9th Cir. 2005), since "nothing in [28 U.S.C. § 1334(c)(1)] prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

But the judge had, and on remand should consider, two other alternatives, because the entry of a monetary judgment after a finding of nondischargeability is "related to [a] case[] under title 11." 28 U.S.C. § 1334(b). One is to determine whether the parties would consent to his adjudicating the claim. See *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015). The other is to submit his proposed findings of fact and conclusions of law to the district judge to accept or reject. See *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165, 2170–72 (2014). As an Article III judge, the district judge is empowered to decide a case governed by state law, in this case the state law that authorizes a suit to collect a debt induced by fraud. He doesn't need the parties' consent.

Dana's claim that the transfer of unsold Chicago units to new LLCs was fraudulent, and Dana's and Robert Joseph's claim for a money judgment, are therefore remanded to the bankruptcy court, with the consequence that the judgment of the district court is

AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART.