In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1666

NEWSPIN SPORTS, LLC, an Illinois limited liability company,

*Plaintiff-Appellant*,

*v.*

ARROW ELECTRONICS, INC., a New York corporation,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cv-00345 — **Samuel Der-Yeghiayan**, *Judge*.

ARGUED NOVEMBER 8, 2018 — DECIDED DECEMBER 3, 2018

Before FLAUM, MANION, and ST. EVE, *Circuit Judges*.

FLAUM, *Circuit Judge*. On January 17, 2017, plaintiff-appellant NewSpin Sports, LLC ("NewSpin") filed a complaint against defendant-appellee Arrow Electronics, Inc. ("Arrow"). In this complaint, NewSpin brought several contract- and tort-based claims against Arrow relating to allegedly defective goods Arrow manufactured and shipped pursuant to a contract between the parties. The district court dismissed the original complaint in its entirety as untimely and entered

judgment against NewSpin on the same day. The district court also denied NewSpin's motion for reconsideration and for leave to file an amended complaint. For the reasons below, we affirm in part and reverse in part the district court's dismissal of NewSpin's complaint. We also reverse the district court's denial of NewSpin's request to amend its complaint in its reconsideration motion, and we remand for further proceedings.

## I. Background

### A. Factual Background

We take the following facts from NewSpin's complaint. Plaintiff-appellant NewSpin provides technology products to help athletes, like golfers and tennis players, analyze and improve their swings. In 2010, NewSpin began the process of producing and launching its flagship "SwingSmart" product. SwingSmart is a sensor module that attaches to sports equipment and analyzes the user's swing technique, speed, and angle. To initiate the production process, NewSpin searched for manufacturers and distributors that could provide the necessary electronic components to make SwingSmart work.

Defendant-appellee Arrow deals in the type of electronic components NewSpin sought to include in SwingSmart. Arrow sales representatives met with NewSpin representatives at least seven times in 2010 and 2011; the parties discussed NewSpin's requirements for the product and Arrow's ability to meet these requirements. Based on these discussions, NewSpin believed that Arrow knew how SwingSmart would function and understood NewSpin's specifications for SwingSmart. Arrow employees further represented to NewSpin that Arrow had "successfully manufactured and

provided substantially similar components for other customers."

Based on these representations, NewSpin signed a contract with Arrow in August 2011 entitled "Materials and Manufacturing Management Agreement Board Assembly" (the "Agreement"). Arrow agreed to "use reasonable commercial efforts" to perform "Work" pursuant to NewSpin purchase orders. Arrow's work as defined in the Agreement was:

> [T]o procure components and other supplies (Components) and to engage a sub-assembly house for the manufacture and assembly of Products (or Boards) through a subcontractor … on [NewSpin's] behalf pursuant to detailed, written specifications … which are provided by [NewSpin] and accepted by Arrow, and to deliver such products to a [NewSpin] designated location.

The Agreement left many of the specifics of each product shipment for NewSpin's future purchase orders: "As [NewSpin] requirements dictate, and on a case by case basis, [NewSpin] will issue a purchase order to Arrow setting forth the quantities, descriptions, prices, and requested delivery dates for the Products to be supplied and Work to be performed.… Each purchase order will reference the applicable Specifications." The price for Arrow's work was also left to be "agreed upon by Arrow and [NewSpin] from time to time as set forth in purchase orders issued by [NewSpin] and accepted by Arrow." However, the Agreement did contain provisions that addressed, among other issues: Arrow's warranty for the products shipped to NewSpin; Arrow's inspection of products; sales tax and shipment terms; and NewSpin's

ability to return shipped products. The Agreement further provided it would "in all respects be governed by and construed in accordance with the laws of the State of New York."

In late 2011, NewSpin sent its first purchase orders to Arrow for fulfillment, and Arrow shipped some components to NewSpin in mid-2012. NewSpin alleges, however, that the components Arrow sent were defective and did not conform to their specifications. A manufacturing expert later identified "pad cratering" as one reason for these defects. NewSpin alleges pad cratering is a common manufacturing issue that Arrow should have known about.

Initially unaware of these defects, NewSpin used Arrow's defective components to build 7,500 SwingSmart units. Of those 7,500 units, only 3,219 could be shipped to customers and, of the 3,219 shipped units, 697 were wholly inoperable. In sum, of the 7,500 SwingSmart units NewSpin initially built, 4,281 units were inoperable or defective. NewSpin alleges it paid Arrow a total of $598,488 for these defective and nonconforming components, and it also incurred over $200,000 in other damages in the form of customer support efforts, module testing, and repair. Furthermore, its receipt of these defective components damaged its brand equity, reputation, and vendor relationships. Additionally, Arrow never delivered over $130,000 worth of components to NewSpin, despite billing NewSpin for them.

## B. Procedural History

NewSpin filed a complaint against Arrow on January 17, 2017, bringing claims for breach of contract (Count I); breach of the implied covenant of good faith and fair dealing (Count II); breach of warranty (Count III); fraud (Count IV);

fraudulent misrepresentation (Count V); unjust enrichment (Count VI); and negligent misrepresentation (Count VII).

Arrow moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing all of these claims were time-barred. The district court agreed and granted the motion to dismiss in its entirety on July 26, 2017. Specifically, the court determined the Agreement was predominantly a contract for the sale of goods subject to the four-year statute of limitations for such contracts set out in Article 2 of the Uniform Commercial Code ("UCC"). It made this determination based on NewSpin's complaint; per the court, "NewSpin's breach of contract allegations make clear that the essence of the contract was for the components and the components' specific parts." The district court also noted the "title" of the Agreement found in the lower left-hand corner of each page, "New Spin Golf LLC Turnkey Agreement 08-10-2011F (2)," reflected that the contract fell within Article 2 of the UCC because it demonstrated Arrow's obligation to deliver "turnkey" goods. *See Turnkey*, Black's Law Dictionary (10th ed. 2014) (term refers to a product "provided in a state of readiness for immediate use").

Because the court determined NewSpin filed its complaint more than four years after the alleged breach—the delivery of allegedly defective goods in mid-2012—it concluded the contract-based claims were untimely. And, since it determined the tort-based claims were predicated on the same allegations underlying the contract-based claims, the court also dismissed those claims as time-barred. The court entered judgment in Arrow's favor on the same day it issued its decision.

NewSpin timely moved for reconsideration pursuant to Rule 59(e). It argued the district court erred in its decision in

several ways, including by not granting leave to amend the original complaint before disposing of the case. NewSpin attached a proposed amended complaint to its reconsideration motion that, it contended, overcame the pleading defects the district court had identified.

The district court denied NewSpin's reconsideration motion in a two-page order on January 29, 2018. The court rejected NewSpin's claims of error in its judgment; it did not address NewSpin's amended complaint except to state that NewSpin had improperly sought "to amend the complaint after the dismissal of the instant action." NewSpin appeals the district court's orders granting the motion to dismiss and denying the motion for reconsideration.[1]

## II. Discussion

We review a district court's grant of a Rule 12(b)(6) motion to dismiss de novo. *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017). We accept all well-pleaded facts in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In order to survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[1] On March 20, 2018, nearly one month after NewSpin's deadline to file a notice of appeal passed, NewSpin filed a motion for extension of time to appeal pursuant to Federal Rule of Appellate Procedure 4(a)(5)(A). Judge Dow, to whom the case was transferred following Judge Der-Yeghiayan's February 2018 retirement, granted the motion. NewSpin thereafter filed a timely notice of appeal on March 26, 2018.

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For fraud claims, a heightened pleading standard applies; a plaintiff "must state with particularity the circumstances constituting fraud or mistake." *Webb v. Frawley*, 906 F.3d 569, 576 (7th Cir. 2018) (quoting Fed. R. Civ. P. 9(b)). A plaintiff is not required to plead elements in his or her complaint that overcome affirmative defenses, such as statute-of-limitations defenses. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). However, "when a plaintiff's complaint nonetheless sets out all of the elements of an affirmative defense, dismissal under Rule 12(b)(6) is appropriate." *Id.* We review a district court's denial of a Rule 59(e) motion for reconsideration and denial of a motion for leave to amend for abuse of discretion. *Manistee Apartments, LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016).

### A. Dismissal of Contract-Based Claims (Counts I–III)

The district court dismissed as time-barred NewSpin's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of warranty. Specifically, the district court determined the Agreement is a contract for the sale of goods subject to the UCC's four-year statute of limitations, and NewSpin's claims based on a mid-2012 contractual breach were untimely by NewSpin's January 2017 filing. NewSpin argues this is error; it says the Agreement is a contract for services subject to a longer limitations period. We agree the Agreement is primarily a contract for the sale of goods, and therefore, because the contract-based claims in the complaint only allege a mid-2012 breach, the district court properly dismissed Counts I–III as time-barred.

### 1. *Choice of Law*

Before turning to the substantive issues, we must determine the correct state law to apply. Because we sit in diversity, we apply the choice-of-law rules used by the state in which the federal district court where the case was filed sits—here, Illinois. *Midwest Grain Prods. of Ill., Inc. v. Productization, Inc.*, 228 F.3d 784, 787 (7th Cir. 2000). Illinois courts usually enforce contractual choice-of-law provisions. *See id.* (citing *Philips Elecs., N.V. v. N.H. Ins. Co.*, 692 N.E.2d 1268, 1278 (Ill. App. Ct. 1998)). In this case, the Agreement states it will be governed by New York law. We accordingly apply New York law to the substance of NewSpin's contract-based claims.

However, as to procedural matters, the law of the forum controls, and in Illinois, "[s]tatutes of limitations are procedural, merely fixing the time in which the remedy for a wrong may be sought, and do not alter substantive rights." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002). Thus, the applicable statute of limitations for each of NewSpin's claims comes from Illinois law, regardless of the relevant substantive law. *See Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 719 (7th Cir. 2018); *Trs. of Operative Plasterers' & Cement Masons' Local Union Officers & Emps. Pension Fund v. Journeymen Plasterers' Protective & Benevolent Soc'y, Local Union No. 5*, 794 F.2d 1217, 1221 n.8 (7th Cir. 1986) ("[A] choice of law provision … is irrelevant when considering which statute of limitation is to be used by the district court.").

This principle applies to the instant question—whether the Agreement is primarily a contract for the sale of goods subject to the UCC. As we recently held, "[t]he question whether a[n] … agreement is a 'contract for sale' is not one of

contract interpretation, but one of statutory interpretation.… And Illinois applies its own law in making that determination, even in the face of an express choice-of-law provision adopting the substantive law of a different state." *Heiman*, 902 F.3d at 719. If it becomes necessary to substantively interpret the Agreement to answer this question, New York law would apply as per the contract's choice-of-law provision; otherwise, Illinois law controls whether the UCC statute of limitations governs the contract-based claims. *See id.*

The district court applied New York law to this question based solely on the Agreement's choice-of-law provision. The parties do not challenge this on appeal. Nonetheless, we will follow Illinois's procedures and apply Illinois law.

### 2. *The Relevant Statute of Limitations*

There is a ten-year statute of limitations for a breach of written contract claim in Illinois. 735 Ill. Comp. Stat. 5/13-206. An exception exists, however, for a breach of contract claim covered by UCC Article 2, which has been adopted in Illinois and applies "to transactions in goods." 810 Ill. Comp. Stat. 5/2-102. Any action for breach of a contract for the sale of goods must instead "be commenced within 4 years after the cause of action has accrued." *Id.* 5/2-725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* 5/2-725(2).

When faced with a mixed contract, involving both the sale of goods and the provision of services, Illinois uses the "predominant purpose" test to determine whether the four-year or ten-year statute of limitations applies. *Belleville Toyota*, 770 N.E.2d at 194. To apply this test, courts assess whether the contract "is predominately for goods with services being

incidental, [or] predominately for services with goods being incidental." *Zielinski v. Miller*, 660 N.E.2d 1289, 1294 (Ill. App. Ct. 1995). In the former case, the UCC limitations period applies; in the latter case, the written contract limitations period controls. *Belleville Toyota*, 770 N.E.2d at 195. Courts review a contract's language and the proportion of goods to services provided for within the contract to assess its predominant purpose. *Brandt v. Bos. Sci. Corp.*, 792 N.E.2d 296, 303 (Ill. 2003); *Bruel & Kjaer v. Village of Bensenville*, 969 N.E.2d 445, 450–51 (Ill. App. Ct. 2012). Courts may also consider a complaint's allegations to make this determination. *Republic Steel Corp. v. Pa. Eng'g Corp.*, 785 F.2d 174, 179 (7th Cir. 1986).

We agree with the district court's conclusion based on both the four corners of the contract and NewSpin's allegations in its complaint. First, the Agreement's provisions demonstrate the predominant purpose of the contract is for Arrow to sell goods to NewSpin. To be sure, at the core of the parties' Agreement is the "Work" Arrow agreed to perform. This work involved certain services on Arrow's part. Arrow agreed to "procure components" and "engage a sub-assembly house for the manufacture and assembly of Products (or Boards) through a subcontractor" according to NewSpin's specifications. The provision of services as well as the sale of goods is to be expected in a mixed contract, though, and that does not answer the question of which purpose is the "primary" or "predominant" one. *See id.* at 181 ("We do not doubt that the design, engineering, and purchase-agency services rendered by [defendant] in furtherance of the Agreement were substantial. That alone, though, is not sufficient to determine the predominant character of a contract….").

Looking further at the definition of Arrow's work, the end result expects that Arrow will "deliver … Products to a [NewSpin] designated location." In other words, NewSpin would provide specifications to Arrow, Arrow would engage a subcontractor to assemble a product based on these specifications, and Arrow would deliver the finished product to NewSpin. The Agreement sets out a purchase-order process by which NewSpin, as its requirements dictate, "will issue a purchase order to Arrow setting forth the quantities, descriptions, prices, and requested delivery dates for the Products to be supplied and Work to be performed."

According to NewSpin's reading of these provisions, Arrow would create a prototype of the component it needed using the provided specifications and, if satisfied with Arrow's work, NewSpin would issue purchase orders for the component Arrow created. The Agreement clarifies, though, that Arrow was not obligated to perform any work until NewSpin issued a purchase order for the components it sought. In other words, any "procur[ing]," "engag[ing]," or "assembl[ing]" services by Arrow would only be incidental to its provision and delivery of a finished good to NewSpin.

Numerous other Agreement provisions confirm that the parties contracted primarily for a sale of goods. For instance, there is no separate payment from NewSpin to Arrow for its work: instead, the price would be "as agreed upon by Arrow and [NewSpin] from time to time as set forth in purchase orders issued by [NewSpin] and accepted by Arrow." In other words, NewSpin would pay for the finished products requested in purchase orders and would not pay separately for Arrow's services; this lack of a price breakdown strongly indicates the predominant purpose of the Agreement is the sale

of goods. *See Bruel & Kjaer*, 969 N.E.2d at 451 (payment of one price after delivery and installation of equipment, rather than multiple payments based on services, indicated contract's predominant purpose was for the sale of goods).

Arrow also provided a warranty in the Agreement that the products it would deliver "are manufactured or assembled pursuant to [NewSpin's] Specifications" and they "shall be free from defects in workmanship." There is no warranty running to the services Arrow would provide, further indicating the Agreement primarily concerns goods. *See Tivoli Enters., Inc. v. Brunswick Bowling & Billiards Corp.*, 646 N.E.2d 943, 948 (Ill. App. Ct. 1995). Additionally, the Agreement makes NewSpin responsible for payment of sales tax, which "is found in the sale of goods, but not services." *Id*. Next, Arrow would ship products to NewSpin "F.O.B.," which means "'free on board,' a term used in transactions in tangible goods." *Bruel & Kjaer*, 969 N.E.2d at 451. Finally, title of delivered goods passes to NewSpin upon shipment, and "the passing of title" is another hallmark of sales contracts. *Id.*; *see also* 810 Ill. Comp. Stat. 5/2-106(1) ("A 'sale' consists in the passing of title from the seller to the buyer for a price….").

The allegations in NewSpin's complaint further confirm this interpretation.[2] NewSpin alleges "Arrow agreed to provide fully functioning components that met NewSpin['s] … specifications, and agreed to provide fully functioning

---

[2] To assess whether the district court properly granted Arrow's Rule 12(b)(6) motion, we look only to the allegations in NewSpin's original complaint, not the allegations in its proposed amended complaint submitted post-judgment. *Cf. Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004) (an original complaint and an amended complaint are two separate documents).

components in conformance with the Agreement." NewSpin also alleges "Arrow agreed to engage a sub-assembly house for the manufacture and assembly of components." However, NewSpin does not claim Arrow breached the Agreement by failing to make this engagement or by engaging a substandard assembly house for this purpose. Instead, NewSpin alleges "the components sent by Arrow were defective and not in conformance with the specifications [NewSpin] had provided to Arrow, the representations Arrow had made, or the Agreement," and Arrow breached the Agreement "by providing [NewSpin] with defective components which failed to perform." NewSpin sought damages for the amount it paid to Arrow for defective components, the amount it was billed for components it did not receive, and the amount it incurred in shipping and replacing defective units. In other words, NewSpin only claims it suffered damages relating to faulty goods, not to any faulty services. This further confirms the predominant purpose of the Agreement is to provide NewSpin with physical goods rather than with assembly services. *See Republic Steel Corp.*, 785 F.2d at 179 (plaintiff's argument that contract was not for a sale of goods "ignores the language of … its complaint").

NewSpin nevertheless points to three characteristics of the Agreement it contends demonstrate the parties bargained for services only: (1) the Agreement states no quantity, price, or delivery date of goods to be produced, ordered, or sold; (2) the Agreement's title demonstrates the parties contracted for management services; and (3) there were no "goods" in existence when the parties signed the Agreement as required for the UCC to apply. However, none of NewSpin's arguments can overcome the plain language of the Agreement itself.

First, although the Agreement does not set out exact quantities, prices, or delivery dates for the goods at issue, the Agreement does address these terms. Per the Agreement, NewSpin's purchase orders must "set[] forth the quantities, descriptions, prices, and requested delivery dates for the Products to be supplied and Work to be performed." There is no need to include this provision in a pure services contract.

NewSpin emphasizes the Agreement contains an integration clause providing that "[t]his Agreement represents the entire agreement between the parties concerning the subject matter hereof, and may not be modified except in a writing signed by both parties." Therefore, according to NewSpin, any terms in later purchase orders (that both parties did not sign) are separate contracts. However, a closer reading of the integration clause demonstrates the purchase orders are part of the Agreement. This provision goes on to state: "When interpreting this Agreement precedence will be given to the respective parts in the following order: (i) this Agreement; (ii) any exhibits to this Agreement; and (iii) if purchase orders are used to release Products, *those portions of the purchase order that are not pre-printed*." (emphasis added). Thus, the integration clause does not preclude introduction of evidence in the purchase orders themselves to supplement the Agreement's interpretation. *Cf. Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 356 (S.D.N.Y. 2005) ("It is generally understood that the purpose of an integration clause 'is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'" (quoting *Primex Int'l Corp. v. Wal-Mart Stores*, 679 N.E.2d 624, 627 (N.Y. 1997))). The Agreement therefore does include specific price, quantity, and delivery terms through the explicitly-integrated purchase orders.

Second, NewSpin points out the Agreement's title ("Materials and Manufacturing Management Agreement Board Assembly") refers to manufacturing "management" but does not reference any "sale" of products. True, courts look to the labels parties use in order to determine contracts' predominant purposes. *Cf. Bruel & Kjaer*, 969 N.E. 2d at 451 (contract was for sale of goods where it referred to parties as "buyer" and "seller"). However, the Agreement's title is only one aspect of its terms; this is not enough to overcome the overwhelming focus of the rest of the contract on the completed products Arrow was to deliver to NewSpin.[3]

Finally, NewSpin's argument that no "goods" existed at the time of the Agreement is also of little consequence. The term "goods" in the UCC refers to "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale." 810 Ill. Comp. Stat. 5/2-105(1). "Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or of any interest therein operates as a contract to sell." *Id.* 5/2-105(2). In the absence of agreement otherwise, identification of goods occurs, in the context of a contract for the sale of future goods, "when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." *Id.* 5/2-501(1)(b); *see also Servbest Foods, Inc. v. Emessee Indus., Inc.*, 403 N.E.2d 1, 7 (Ill. App. Ct. 1980) ("Identification is that process by which goods

---

[3] Unlike the district court, we put little dispositive weight on the footer located in the bottom left-hand corner of each page of the Agreement designating this as a "turnkey" contract. The word "turnkey" does not appear anywhere else in the Agreement.

are linked, set aside, or otherwise designated as those to which a contract refers."). Although no products existed at the time the parties signed the Agreement, the components did exist when Arrow shipped them to NewSpin. The Agreement contains no provision for identification, so the electronic components became "identified" when shipped. At that time, the products subject to the Agreement were "movable" goods subject to the UCC.

In sum, the contractual provisions the parties agreed to, along with the allegations in NewSpin's complaint, demonstrate the Agreement's predominant purpose is the sale of goods to NewSpin. Any breach-of-contract claims relating to the Agreement are accordingly subject to the UCC's four-year statute of limitations. We now assess the timeliness of NewSpin's contract-based claims using this limitations period.[4]

### 3. *Breach of Contract Claim (Count I)*

In Count I, NewSpin alleges Arrow breached the Agreement by providing it with "defective and deficient components." To state a claim for breach of contract under New York law, NewSpin must allege "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d

---

[4] We note this result would be the same if we applied New York law as the district court did. New York has also adopted the UCC, including its four-year statute of limitations for breach-of-contract actions involving the sale of goods, *see* N.Y. U.C.C. Law § 2-725(1), and New York also uses the predominant purpose test to determine whether a mixed contract is predominantly one for goods or for services. *See Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742 (2d Cir. 1979).

Cir. 2000) (quoting *First Inv'rs Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)).

NewSpin alleges it sent its first purchase orders to Arrow in late 2011, and Arrow shipped defective components "in mid-2012." Although the complaint only alleges Arrow made "some" shipments at that time, there is no mention of any other shipments. Thus, NewSpin only alleges Arrow breached the Agreement, if at all, in mid-2012. However, NewSpin did not file the complaint until January 17, 2017. No matter what month is considered "mid" 2012, NewSpin did not file its claims until after the four-year window provided for in the statute of limitations. NewSpin makes no argument that this alleged mid-2012 breach would be timely using a four-year limitations period. Therefore, NewSpin's breach-of-contract claim is untimely, and the district court properly dismissed it.

### 4. *Breach of the Implied Covenant of Good Faith and Fair Dealing Claim (Count II)*

In Count II, NewSpin alleges Arrow "breached the covenant of good faith and fair dealing by choosing to use improper, unfit or substandard components and failing to advise [NewSpin] that Arrow's components did not meet the specifications and business requirements provided by" NewSpin.

New York "recognize[s] that in appropriate circumstances an obligation of good faith and fair dealing on the part of a party to a contract may be implied and, if implied will be enforced." *Sheth v. N.Y. Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (App. Div. 2000) (citation omitted). "The implied covenant of good faith and fair dealing is breached when a party acts in a

manner that would deprive the other party of the right to receive the benefits of their agreement." *1357 Tarrytown Road Auto, LLC v. Granite Props., LLC*, 37 N.Y.S.3d 341, 343 (App. Div. 2016). But a claim for breach of this covenant "is intrinsically tied to the damages allegedly resulting from a breach of the contract" and "may not be used as a substitute for a nonviable claim of breach of contract." *Smile Train, Inc. v. Ferris Consulting Corp.*, 986 N.Y.S.2d 473, 475 (App. Div. 2014) (citations omitted). In other words, the implied covenant claim is a contract claim and is subject to the same four-year statute of limitations. *See id.* (noting it would be "anomalous" if a contract claim and an implied covenant claim were subject to different limitations periods). Therefore, the district court also properly dismissed Count II as time-barred.

### 5. Breach of Warranty Claim (Count III)

In Count III, NewSpin alleges Arrow breached the Agreement's express warranty "by providing defective and deficient components that failed to conform with NewSpin['s] specifications." "A successful claim of a breach of express warranty requires proof that an express warranty existed, was breached, and that plaintiff had relied on that warranty." *Reed v. Pfizer, Inc.*, 839 F. Supp. 2d 571, 578 (E.D.N.Y. 2012) (applying New York law).

Under Illinois law, a breach of warranty claim accrues "when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." 810 Ill. Comp. Stat. 5/2-725(2). However, warranties to repair, replace, or adjust defects in

products are not warranties as to future performance. *See Cosman v. Ford Motor Co.*, 674 N.E.2d 61, 66 (Ill. App. Ct. 1996).

According to the Agreement, Arrow "warrants for a period of ninety (90) days from date of shipment" to NewSpin that the products it ships "are manufactured or assembled pursuant to" NewSpin's specifications and "shall be free from defects in workmanship." If a product does not comply with this warranty, the Agreement further provides NewSpin could return it to Arrow and the product would be "promptly repaired or replaced, or the purchase price paid therefor refunded or credited, at Arrow's option."

The Agreement thus limits NewSpin's potential remedies to repair or replacement, unless Arrow decides to refund the purchase price, and NewSpin does not argue the Agreement's warranty extends to future performance. The breach-of-warranty claim therefore accrued when "tender of delivery" took place, or when "the seller put and [held] conforming goods at the buyer's disposition and [gave] the buyer any notification reasonably necessary to enable him to take delivery." 810 Ill. Comp. Stat. 5/2-503(1). This happened upon Arrow's shipment of goods in mid-2012, more than four years prior to NewSpin's complaint. Thus, this claim is also time-barred.

### B. Dismissal of Tort-Based Claims (Counts IV–VII)

The district court dismissed NewSpin's unjust enrichment, negligent misrepresentation, fraud, and fraudulent misrepresentation claims as untimely. Specifically, the court determined these claims were all duplicative of the breach-of-contract claims and therefore also time-barred. NewSpin contends this decision is erroneous because its tort claims are separately actionable and subject to longer limitations periods

than the contract-based claims. We affirm the district court's dismissal of NewSpin's unjust enrichment and negligent misrepresentation claims in Counts VI and VII. However, we conclude NewSpin sufficiently alleged a separately-actionable fraud in Counts IV and V, and we reverse the district court's decision dismissing these claims.

### 1. *Choice of Law*

The district court correctly applied New York law to the substance of NewSpin's tort-based claims. We again look to Illinois to determine the applicable state law. *See Midwest Grain Prods. of Ill.*, 228 F.3d at 787. Although the Agreement contains a New York choice-of-law provision, NewSpin's tort-based claims do not obviously fall under that provision's purview. Still, in Illinois, "tort claims that are dependent upon the contract are subject to a contract's choice-of-law clause regardless of the breadth of the clause." *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002). In determining whether a tort claim is contract-dependent, "courts examine whether the action alleges a wrong based upon interpretation and construction of the contract, or whether the claim alleges elements constituting an independent tort." *Id.*; *see also Kuehn v. Childrens Hosp., L.A.*, 119 F.3d 1296, 1302 (7th Cir. 1997) ("[A] [contractual choice-of-law] provision will not be construed to govern tort as well as contract disputes unless it is clear that this is what the parties intended."). Here, the tort-based claims depend on the contract—all of NewSpin's allegations involve the parties' relationship as governed by the Agreement. Therefore, New York law applies to the substance of the claims, although again, Illinois law controls the applicable statute of limitations.

### 2. *Unjust Enrichment Claim (Count VI)*

In Count VI, NewSpin claims "it would be unfair and would unjustly enrich Arrow to retain [NewSpin's] money despite delivering defective components to NewSpin." The district court concluded this claim was untimely as "essentially duplicative" of NewSpin's breach-of-contract claim. We agree, and NewSpin cannot separately maintain an unjust enrichment claim under New York law.

"[U]njust enrichment … is available only in unusual situations when, though the defendant has not breached a contract or committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). Generally, in New York, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.* "[A] claim for unjust enrichment is not duplicative of a breach of contract claim where the plaintiff alleges that the contracts were induced by fraud." *Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 161 (App. Div. 2010). But when the unjust enrichment claim only seeks to replicate a contract or tort claim, it must be dismissed. *See Walter H. Poppe Gen. Contracting, Inc. v. Town of Ramapo*, 721 N.Y.S.2d 248, 249 (App. Div. 2001) (unjust enrichment claim properly dismissed where "the damages sought are merely for breach of contract").

NewSpin argues the district court should not have dismissed the unjust enrichment claim because it alleges the contract was induced by fraud. However, in the complaint, NewSpin alleges Arrow received $598,488 from NewSpin that it should not be allowed to retain "despite delivering defective components to NewSpin." This is the same amount

NewSpin alleges it paid to Arrow for the allegedly defective components. NewSpin essentially restates its breach-of-contract claim in its entirety by alleging it paid money to Arrow but only received defective components in return. Whether or not this claim is considered timely, this alleged conduct forms the essence of the parties' agreement and cannot separately support an unjust enrichment claim under New York law. *See Corsello*, 967 N.E.2d at 1185.

Moreover, NewSpin's unjust enrichment claim cannot survive based on Rule 8(d)(3)'s allowance of inconsistently-pled claims. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Count VI does not plead unjust enrichment in the alternative; it incorporates the other paragraphs of the complaint alleging the existence of a contract covering this claim, foreclosing NewSpin's ability to pursue recovery based on this theory as pled. *See Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 538 (S.D.N.Y. 2017) (where plaintiff had not challenged validity or enforceability of governing contract, "the unjust enrichment claim [was] duplicative").

Therefore, the district court properly dismissed NewSpin's unjust enrichment claim in Count VI.

### 3. *Negligent Misrepresentation Claim (Count VII)*

In Count VII, NewSpin brings a claim for negligent misrepresentation. NewSpin alleges Arrow "made misrepresentations of material fact and failed to disclose material facts without reasonable care with knowledge that such misrepresentations … would be relied upon by [NewSpin] in its business transaction with Arrow." The district court dismissed

this claim based on both the four-year limitations period and the economic loss rule.

In New York, "[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011) (alteration in original) (quoting *J.A.O. Acquisition Corp. v. Stavitsky*, 863 N.E.2d 585, 587 (N.Y. 2007)).

We need not decide if this claim duplicates NewSpin's contract claims because we agree the economic loss rule bars recovery. Under New York law, "inasmuch as the damages established by [a plaintiff] are properly characterized as 'economic loss' they are not recoverable in an action for tort based upon negligent misrepresentation." *Gen. Elec. Co. v. A.C. Towne Corp.*, 534 N.Y.S.2d 283, 285 (App. Div. 1988); *see also Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 734 F. Supp. 2d 368, 378 (S.D.N.Y. 2010) ("New York's economic loss doctrine is a jurisprudential principle that a plaintiff cannot recover in tort for purely economic losses caused by the defendant's negligence.").

In its negligent misrepresentation claim, NewSpin only alleges Arrow made misrepresentations regarding Arrow's component parts and their conformity to NewSpin's specifications. These misrepresentations solely relate to the subject matter of the Agreement, pursuant to which Arrow was to provide NewSpin with specific components. The only damages attributable to these misrepresentations are the same damages NewSpin would recover for its breach-of-contract claim: the amount it lost because of Arrow's defective

delivery. NewSpin cannot recover for these purely economic losses. *See Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007) ("While [plaintiff] has properly pled all of the elements required to state a cause of action for negligent misrepresentation, it has pled purely economic damages as a result of its reliance, thereby inviting application of New York's 'economic loss rule.'"); *cf. Ocean Gate Homeowners Assoc., Inc. v. T.W. Finnerty Prop. Mgmt., Inc.*, 83 N.Y.S.3d 494, 497 (App. Div. 2018) ("[W]here [a] plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." (alterations in original) (quoting *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992))).

The district court thus properly dismissed NewSpin's negligent misrepresentation claim in Count VII.

### 4. *Fraud Claims (Counts IV–V)*

In Counts IV and V, NewSpin brings claims for fraud and fraudulent misrepresentation respectively. The district court dismissed both claims as duplicative of the contract claims and thus also time-barred. NewSpin contends this was in error because its fraud claims allege Arrow owed it a duty distinct from the duty to perform under the Agreement. We agree and reverse the district court's dismissal of these claims.

To state a claim for fraud or fraudulent inducement under New York law, a plaintiff must allege that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168,

186–87 (2d Cir. 2004) (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)); *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996).

The general rule in New York is that "a fraud cause of action … does not arise where the alleged fraud merely relates to a breach of contract." *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 278 (S.D.N.Y. 2004). However, "it is well established that a misrepresentation of present fact which is the inducement for a contract is collateral to said contract, and can support a separate fraud claim." *Id.* at 279; *see also Gosmile, Inc. v. Levine*, 915 N.Y.S.2d 521, 524 (App. Div. 2010) ("[A] misrepresentation of present facts, unlike a misrepresentation of future intent to perform under the contract, is collateral to the contract, even though it may have induced the plaintiff to sign it, and therefore involves a separate breach of duty."). But "[a] fraud-based cause of action is duplicative of a breach of contract claim 'when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract.'" *Mañas v. VMS Assocs., LLC*, 863 N.Y.S.2d 4, 7 (App. Div. 2008) (quoting *First Bank of the Ams. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 21 (App. Div. 1999)).

Thus, to maintain a fraud claim separate from a breach-of-contract claim, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone*, 98 F.3d at 20 (citations omitted).

In both Counts IV and V, NewSpin alleges that in their meetings prior to signing the Agreement, Arrow misrepresented "that Arrow's components met [NewSpin's] specifications." NewSpin further alleges Arrow "misrepresented that Arrow had the skillset to provide, and had provided, substantially similar components to other Arrow customers" and "made misrepresentations of material facts … regarding Arrow's components, including without limitation its switches, batteries, computer processors, ball grid arrays and solder balls."

NewSpin sufficiently alleges Arrow breached "a legal duty separate from the duty to perform under the contract," *Bridgestone/Firestone*, 98 F.3d at 20, because it misrepresented present facts collateral to the Agreement. Arrow's alleged misrepresentations cover its own experience in this field and its past dealings with other customers besides NewSpin; Arrow's performance under the Agreement does not cover such promises. *See Coolite Corp. v. Am. Cyanamid Co.*, 384 N.Y.S.2d 808, 810 (App. Div. 1976) (defendant's representations "concerning the state of its research and testing" were "representations of fact and not merely promises of future action" that induced plaintiff to enter into agreement, and "[a]llegations of this character are sufficient to sustain a fraud claim"). Moreover, Arrow's alleged misrepresentations regarding the status of its own components—like its switches and batteries—relate to the presently-existing facts of the suitability of the raw materials Arrow would use in its manufacturing process. *See First Bank of Ams.*, 690 N.Y.S.2d at 21 (reinstating fraud claim where it was "premised on allegations that defendants misrepresented various pertinent facts about" the products plaintiff purchased, and concluding "[t]his cannot be characterized merely as an insincere promise of future

performance"). Taking NewSpin's allegations as true, as we must at this stage, NewSpin has alleged Arrow materially misrepresented the currently-existing state of its own experience and materials, Arrow knew these misrepresentations were untrue, Arrow made these statements to induce NewSpin to enter into the Agreement, and NewSpin relied upon these misrepresentations in doing so. These allegations are sufficient to maintain NewSpin's fraud claims independent of its contract-based claims.[5]

Because the fraud claims are not duplicative of the contract-based claims, they are not subject to the UCC's four-year limitations period. The statute of limitations for fraud claims in Illinois is five years. *See CitiMortgage, Inc. v. Parille*, 49 N.E.3d 869, 884 (Ill. App. Ct. 2016) (citing 735 Ill. Comp. Stat. 5/13-205). It "begins to run when the claimant discovers or should have discovered that he has been injured by a wrongful act." *In re Collazo*, 817 F.3d 1047, 1050 (7th Cir. 2016) (citing *Knox Coll. v. Celotex Corp.*, 430 N.E.2d 976, 979–80 (Ill. 1981)). The exact date on which NewSpin could have discovered Arrow's alleged fraud is unclear from the face of the complaint, but it could not have happened before the first shipment in mid-2012. Thus, NewSpin's filing of its fraud claims in January 2017 fell within that five-year limitations period.

---

[5] Arrow argues that NewSpin additionally cannot maintain its fraud-based claims because they are not pled with the requisite particularity under Rule 9(b). However, the district court never addressed this issue, and it has not been fully briefed on appeal. Given the likelihood of an amended pleading on remand, the district court can address whether the fraud claims as pled in the ultimately operative complaint meet this heightened pleading standard.

Because the district court erred in dismissing NewSpin's fraud claims in Counts IV and V on timeliness grounds, we reverse the district court's decision in that respect.

### C. Denial of Motion to Reconsider and to Amend

We also agree with NewSpin that the district court abused its discretion in refusing it any opportunity to amend the original complaint.

"Ordinarily … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). When a plaintiff requests such leave to amend, district courts should "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "The Supreme Court has interpreted this rule to require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357–58 (7th Cir. 2015).

Once a district court enters final judgment dismissing a case, though, "the plaintiff cannot amend under Rule 15(a) unless the judgment is modified, either by the district court under Rule 59(e) or 60(b), or on appeal." *Runnion*, 786 F.3d at 521. These remedies are considered "extraordinary," but we still review post-judgment motions for leave to amend according to Rule 15 in situations, like this one, where a district court enters judgment at the same time it first dismisses a case. *Runnion*, 786 F.3d at 521; *Gonzalez-Koeneke v. West*, 791 F.3d 801, 808 (7th Cir. 2015). And we have found abuses of discretion in circumstances where district courts dismiss an

original complaint with prejudice, without addressing a proposed amended complaint. *See, e.g.*, *Runnion*, 786 F.3d at 518 (district courts face a "high risk" of abusing their discretion when plaintiffs are denied any opportunity to amend); *Bausch v. Stryker Corp.*, 630 F.3d 546, 561–62 (7th Cir. 2010); *Foster v. DeLuca*, 545 F.3d 582, 584–85 (7th Cir. 2008).

Here, the district court entered judgment against NewSpin at the same time it dismissed NewSpin's original complaint. NewSpin then timely filed a Rule 59(e) motion that included a request for leave to amend and properly attached a proposed first amended complaint to its motion. *Cf. Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir. 2009) (no abuse of discretion to deny a post-judgment motion to amend where plaintiff did not proffer an amended complaint). The proposed amended complaint includes more allegations regarding the services Arrow provided under the Agreement and provides more detail regarding the alleged misrepresentations Arrow made about its expertise. The amendments also clarified that Arrow continued to deliver allegedly defective components to NewSpin into 2013, and NewSpin attached a March 2013 purchase order as an exhibit.

In denying the Rule 59(e) motion, the district court did not address these proposed amendments or otherwise provide any reason for why it would not allow NewSpin the opportunity to amend. The court only stated NewSpin "improperly [sought] to … seek to amend the complaint after the dismissal of the instant action." Since the district court did not examine the merits of the proffered amended complaint before it decided the Rule 59(e) motion, the district court abused its discretion. *See Paganis v. Blonstein*, 3 F.3d 1067, 1073 n.7 (7th Cir.

1993). Accordingly, we reverse and remand to the district court for further proceedings on this issue.[6]

### III. Conclusion

For the foregoing reasons, we AFFIRM in part and REVERSE in part the district court's dismissal of the complaint, we REVERSE the district court's denial of NewSpin's request to amend its complaint in its reconsideration motion, and we REMAND to the district court for further proceedings.

---

[6] A district court does not abuse its discretion in denying leave to amend where the amendment would be futile, *see Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018), but NewSpin's proposed amended complaint is not futile. NewSpin's original complaint states valid fraud and fraudulent misrepresentation claims against Arrow based on Arrow's alleged precontractual misrepresentations, and the proposed amended complaint realleges these claims. Moreover, while NewSpin's new allegations cannot change the Agreement's primary purpose and the resultant four-year limitations period for contract-based claims, the amended complaint alleges further defective deliveries in 2013 that could be timely if they relate back to the original 2017 complaint. *See* Fed. R. Civ. P. 15(c)(1)(B) ("[A]n amendment to a pleading relates back to the date of the original pleading when … the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."). We leave it to the district court to assess, in the first instance, whether the amended pleading sufficiently addresses this timeliness issue and the other pleading deficiencies we identified in the original complaint.